In re MATHIS INSURANCE AGENCY, INC., Debtor.

In re Clemothene MATHIS, Debtor.

Bankruptcy Nos. LR 84–1191M, LR 84–1192M.

United States Bankruptcy Court, E.D. Arkansas, W.D.

May 29, 1985.

David R. Grace, Little Rock, Ark., for debtors.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On February 8, 1985, a consolidated hearing was held on identical motions to dismiss the above-styled Chapter 7 proceedings filed by each debtor. Several responses objecting to these motions were filed. Mathis Insurance Agency, Inc., LR 84–1191M, is a corporation. All of the stock in Mathis Insurance Agency, Inc., is owned by the debtor in LR 84–1192M, Clem Mathis.

At the hearing, Clem Mathis testified that he had moved to Tennessee subsequent to the filing for bankruptcy relief in Arkansas. Clem Mathis and his wife, Angela, both unemployed, are living with Mr. Mathis' mother, Einel Mathis. Mr. Mathis was seeking employment in the area of buying/selling leases in Tennessee at the time of the hearing.

Clem Mathis stated several grounds seeking to justify dismissal of both bankruptcy petitions. First, Mathis Insurance Agency, Inc.'s, accounts receivable are now being paid, when prior to bankruptcy, the accounts receivable were not coming in. Second, creditors of this debtor are reducing the amounts of their claims against the debtor by crediting the debtor for payments which it had previously not been given credit. Third, Clem Mathis thinks that he can best deal with creditors in state court where many suits are presently pending against both the corporation and Clem Mathis, personally, rather than proceeding in this Court.

During this proceeding, the Court heard substantial evidence of fraudulent conduct by Clem Mathis upon creditors of both estates. A substantial portion of property has been conveyed for minimal or no consideration to Clem Mathis' mother, Einel Mathis, Clem Mathis' present wife, Angela, various business partners, and third parties. The property consists of:

A. gas wells
B. lake house and property
C. four automobiles
D. airplane
E. boat
F. Mathis-McClellan real property
G. renewals of insurance policies
H. Tennessee office building
I. stock in U-Joint, Inc.
J. Houston, Texas, real property
K. duplex

In addition, the Court was presented with a substantially false financial statement of Clem Mathis, which listed many of the above properties and other interests, as assets of Clem Mathis on December 1, 1983, when, in fact, they were not. Mr. Mathis asserted that he had never seen or

authorized the making of the December, 1983, financial statement which was "not right." He testified that his present wife, Angela, had prepared the statement upon the request of First Commercial Bank of Little Rock, Arkansas. The last financial statement prepared by Mr. Mathis, himself, was in December of 1982.

Clem Mathis was an incorporator and officer of TenArk Corporation, an Arkansas corporation, which later became Mathis Oil Company. The stockholders of Mathis Oil Company were Mary Lester, Bobby Allen and Einel Mathis. Einel Mathis withdrew from Mathis Oil Company because the stockholders "couldn't get along." She relinquished her ⅓ interest in the company for no consideration because she "put little into the company." Mr. Mathis testified that the company never profited. The Mathis Oil Company bank statements were mailed to Clem Mathis.

The Othel Houston gas wells lease was listed on the 1983 financial statement as an asset of Clem Mathis and was valued at $3,375,000. Mr. Mathis testified that he had negotiated in 1982 for the acquisition of the leasehold interest in the wells for an employee of Mathis Oil Company, Mary Lester. The lease was initially titled in the names of Clem Mathis and Mathis Oil Company, although Mr. Mathis disclaimed any ownership in the lease. Mr. Mathis testified that Mary Lester paid $200,000 for the lease which was subsequently turned over to Mathis Oil Company for no consideration. In 1983, Mathis Oil Company put the wells into production and all revenues from the wells went into Mathis Oil Company. The debtor thought the wells were still producing although he had seen no records on them. Mathis Oil Company continues to retain the Othel Houston gas lease.

There was also evidence that Mr. Mathis had put $75,000 in loan proceeds in 1982 into three Tennessee oil and gas wells, Webb 1, Webb 2, and Mitchell 1. One of the oil wells produced for a short time before turning to salt water, and the other wells were dry holes. The production reve-

nues from the wells were put back into Mathis Oil Company.

The December, 1983, financial statement listed lake property valued at $210,000 as an asset of Clem Mathis. The debtor's testimony revealed that the lake house property was purchased in Mr. Mathis' name and was deeded to Einel Mathis in late 1981. At that time, the mortgage payments on the property were current. Mathis Insurance Agency, Inc., leased the lake house from Einel Mathis and also made all payments on the lake house in 1981, 1982 and 1983. The debtor testified that Mathis Insurance Agency, Inc., used the lake house for business purposes. The guest log for the lake house is missing. Mr. Mathis' explanation for the transfer of the lake house to his mother was that she had made a $15,000–$16,000 down payment on the purchase price of the property and that Mr. Mathis was single when the property was purchased and has since remarried. The lake house was again transferred in August of 1984 to J.L. Burros Residential Development Corp., for $125,000. Clem Mathis signed all sale documents as attorney-in-fact for his mother. Mr. Mathis received a $70,000 check from J.L. Burros Residential Development Corp., which he testified that he mailed to his mother. The buyer also paid the bank's mortgage of $40,000.

Listed on the 1983 financial statement were automobiles valued at $71,800. Mr. Mathis testified that he had owned a 1975 Mercedes, a 1979 Mercedes, a 1975 Bronco and a MG until January of 1984. Upon examination, Mr. Mathis testified that the automobiles were sold to Mathis Oil Company in January, 1984. Mr. Mathis received a $20,000 check from Mathis Oil Company which he exchanged for "lots of cashier's checks." The cashier's checks were periodically cashed and used for the debtor's living expenses. Mr. Mathis later testified that his mother, Einel, bought the cars individually even though the cars went to Mathis Oil Company. When Einel Mathis left Mathis Oil Company, she took the automobiles with her. The cars subsequently went into a newly formed (Janu-

ary, 1984) corporation, Mid Continent Energy, Inc., owned 100% by Einel Mathis. Mid Continent Energy, Inc., sold the 1979 Mercedes a few months ago for $11,000 cash. Mr. Mathis and his wife continue to have access to the Bronco, and the 1975 Mercedes. Mr. Mathis drove a 1978 Lincoln Continental to the first meeting of creditors and to this hearing. The Lincoln is also owned by Mid Continent Energy, Inc. The only other business of this corporation, that Mr. Mathis was aware of, is the ownership of one producing gas well located near Deer Lodge, Tennessee. The gas well production revenues vary between $2,000–$3,000 per month. The debtor's statement of financial affairs reveals that a copy machine owned by debtor was "sold to Mid Continent Energy, Inc., in consideration of its agreement to assume payments." The transaction was in January of 1984.

An airplane valued at $40,000 appeared on the December, 1983, financial statement, although the debtor testified that he did not own it on December 1, 1983. Mr. Mathis purchased the twin engine plane in 1977 along with Mr. Charles Arnold, of Hot Springs, Arkansas, each owning a ½ interest in the plane. In late 1983, Mr. Mathis transferred, for no consideration, his ½ interest in the plane to Mr. Arnold. Mr. Arnold assumed the indebtedness on the plane. The explanation for the transfer for no consideration was that the plane needed an annual checkup costing $7,500–$10,000, the plane needed a new engine at a cost of $25,000–$30,000, there was a note of several thousand dollars on the plane, and the insurance and storage were costing $250–$300 per month. These costs would be borne by the debtor and his partner, Mr. Arnold. Although Mr. Mathis testified of an existing note on the plane, the financial statement reflected the liability for "auto and airplane loans" as $0. There was evidence presented that the debtor corporation, Mathis Insurance Agency, Inc., made Mr. Mathis' one-half payment on the plane. Mr. Mathis testified that the fair market value of the plane in its present condition was $16,000.

Mr. Mathis owned a 1972 Cris Craft boat valued on the December, 1983, financial statement at $7,500. The boat was sold in the summer of 1983 to Mr. Bobby Allen of Tennessee, a shareholder in Mathis Oil Company, Inc. The sale price was $1,000.

Mathis Insurance Agency, Inc., was formerly Mathis-McClellan Insurance Agency (Mathis-McClellan). Clem Mathis bought out his partner's, Mr. John McClellan's, 30% interest in 1979, becoming 100% shareholder of Mathis-McClellan. Clem Mathis' ownership in Mathis-McClellan is reflected on the notes to his October, 1982, financial statement as 100% at a fair market value of $600,000. In October of 1982, Mathis-McClellan ceased doing business, yet the real estate of the business was not sold until late, 1983 or early, 1984. After Mathis-McClellan ceased doing business, Mr. Mathis began doing business as Mathis Insurance Agency, Inc. The officers of Mathis Insurance Agency, Inc., were: Clem Mathis, President and Angela Mathis, Secretary. The statement of financial affairs of the debtor reveals that Einel Mathis was the Vice President of the debtor corporation. The debtor corporation ceased doing business in early 1984. Mr. Mathis is no longer licensed to sell insurance in Arkansas.

Mathis Insurance Agency, Inc., underwrote insurance policies which were renewable annually. Clem Mathis testified that he had attempted to sell renewals of Mathis Insurance Agency, Inc.'s customers' policies to a Mr. Edgars. There was an installment sale contract of the renewals prepared. Clem Mathis was to receive 30–40% of the renewal profits of each policy under the terms of the contract. The contract was never signed. In contemplation of the sale of the renewals, Mr. Mathis allowed Mr. Edgars to access the company policy renewal files. Mr. Mathis stated that Mr. Edgars may have even made some renewals of Mathis Insurance Agency, Inc.'s, policies, but no money had been received by Mr. Mathis for the renewals of any policies made by Mr. Edgars.

A Tennessee office building was scheduled on Mr. Mathis' 1983 financial statement at $157,500. The property was purchased in 1983 and was titled in Clem Mathis' name for a few months. The debtor transferred the building to Mathis Oil Company, for no consideration because Mathis Oil Company made the initial down payment on the building and because Mr. Mathis, himself, had no equity in the property. Mathis Oil Company retained the office building even after Einel Mathis relinquished her ⅓ stockholder interest in the company.

Clem Mathis was a 50–50 partner with Steve Held in U-Joint, Inc., a Houston based company that sold foreign car parts. The U-Joint, Inc., also had a sale contract on the building it was operating from. In July, 1983, the debtor assigned his 50% interest to Mr. Held in exchange for a $50,000 or a $55,000 note. The note was assigned to Einel Mathis in July, 1983, because she had made a $17,000 loan to Clem Mathis on his house in North Little Rock, Arkansas, Mr. Mathis testified.

Clem Mathis owned real estate in Houston, Texas. Although the evidence was scant, the debtor testified that he sold the property in June or July of 1983 to Steve Held.

A duplex is listed on the 1983 financial statement and is valued at $68,250. Listed on the schedules, which are filed with the Court, is the duplex which Clem Mathis sold in late May, 1984, for $46,000 cash. Mr. Mathis testified that he spent $20,000 for living expenses, $8,000 for past legal services, $2,000 for present bankruptcy legal services and $10,000 for travel expenses to and from his new residence in Memphis, Tennessee.

In addition, the December, 1983, financial statement scheduled a cash value of life insurance worth $4,000. The debtor testified that there was actually no value in that policy in December, 1983. Also the financial statement listed "other" personal property at $102,000. The debtor testified that he had no idea what "other" represented unless it was the contents on the homeowner's policy.

Mr. Mathis' statement of financial affairs reflects Fourth Street property sold on May 31, 1984, for $105,000. Mr. Mathis testified that he received $20,000 cash which he used as living expenses. The remainder of the money went to pay off the mortgages on the property.

11 U.S.C. § 707, dismissal, provides that

The court may dismiss a case under this chapter only after notice and a hearing and only for cause.

Although not specifically provided for in Bankruptcy Code § 707, the case law is clear that the debtor can move for dismissal of a voluntarily filed case. *Matter of Williams*, 15 B.R. 655 (E.D.Mo., E.D. 1981); *In re Underwood*, 24 B.R. 570 (S.D.W.Va., Charleston D.1982). Unlike a Chapter 13 bankruptcy case, where the debtor has an absolute right to dismissal, a debtor has no corresponding right to dismiss a Chapter 7 petition. *In re Waldrep*, 20 B.R. 248 (Bkrtcy.W.D.Tex., San Antonio D.1982); *In re Martin*, 30 B.R. 24 (Bkrtcy. E.D.N.C.1983).

A showing of cause justifying dismissal of the case is required. The debtor asserts that claims of creditors are being reduced which enhances his ability to pay the debts. Adequate cause to dismiss does not necessarily exist upon a showing by the debtor of his ability to pay debts. *Matter of Williams*, 15 B.R. 655 (E.D.Mo., E.D. 1981). Even an expectant recovery in civil litigation does not rise to the level of cause justifying dismissal of a case. *Matter of Bryant*, 28 B.R. 362 (Bkrtcy.N.D.Ind., Fort Wayne D.1983).

The most important consideration when dismissing a case is whether dismissal is in the best interest of creditors. *In re Banks*, 35 B.R. 59 (Bkrtcy.D.Md.1983). Generally, if dismissal of the debtor's case results in prejudice to the creditors, it is not proper for the case to be dismissed unless all creditors affirmatively consent to the dismissal. *Matter of Williams*, 15 B.R. 655 (E.D.Mo., E.D.1981); *In re Kimball*, 19

B.R. 300 (Bkrtcy.D.Maine 1982); *Hammerer v. Internal Revenue Service*, 18 B.R. 524 (Bkrtcy.E.D.Wisc.1982); *In re Hall*, 15 B.R. 913 (Bkrtcy.App. 9th Cir.1981).

In this case the debtor argues that creditors will suffer no harm by dismissal because creditors are free to pursue their state court remedies. Not only would this forestall the present efforts of creditors, it is unlikely that a substantial dividend could be returned to creditors, by returning the case to state court. *See In re St. Laurent*, 17 B.R. 768 (Bkrtcy.D.Maine 1982).

■ Mr. Mathis asserts that a refiling of the petition at the appropriate time in Tennessee would enhance the prospects for an orderly liquidation of the estate. Assuming the debtors would refile in Tennessee, the change in forum would only be of convenience to Mr. Mathis who voluntarily moved to and now lives in Tennessee and would clearly block pursual by creditors and place an increased travel expense on creditors. Possible refiling of a petition in another district does not constitute adequate cause for dismissal of the case. *In re Kapsos*, 18 B.R. 88 (Bkrtcy.S.D.Fla. 1982); *In re Kimball*, 19 B.R. 300 (Bkrtcy. D.Maine 1982); *Hammerer v. Internal Revenue Service*, 18 B.R. 524 (Bkrtcy.E.D. Wisc.1982).

The debtor, Mathis Insurance Agency, Inc., asserts that since the filing of the petition, some of the accounts receivable are now being paid. The fact that creditors desire to pay the debtor now, is actually reason to require the debtor to remain in bankruptcy court, rather than allow the debtor to proceed in state court or to refile at Mr. Mathis' leisure. Dismissal would require extended time and forbearance for creditors in collection of their claims. *See Matter of Williams*, 15 B.R. 655 (E.D.Mo., E.D.1981).

■ The Court heard substantial testimony of fraudulent conduct by Mr. Mathis. This is evidence to be considered if a creditor objects to the discharge of Clem Mathis. A debtor who files a voluntary bankruptcy petition in Chapter 7 not only invokes the safeguards mandated by the Code, "but also assumes the responsibility imposed under the bankruptcy law." *In re Martin*, 30 B.R. 24, 26 (Bkrtcy.E.D.N.C. 1983). Among these responsibilities is the duty of the debtor to account for assets, complete schedules in good faith and submit to the trustee's requests for documents. In this case, both debtors have not only failed to fairly attend to their responsibilities as a debtor, but they are now seeking to completely avoid these responsibilities by asking that these bankruptcy cases be dismissed. No debtor should expect to abuse the bankruptcy process by using it to his benefit to forestall the collection of debts and seek to escape the web of trickery so keenly woven about the creditors.

■ Confidence of the public in the bankruptcy system must be upheld to the highest degree. *In re Pagnotta*, 22 B.R. 521 (Bkrtcy.D.Md.1982). Having submitted themselves to the jurisdiction of the Court and availed themselves of the protection of the Court, debtors whose fraudulent acts are discovered may not freely dismiss their case once the fraud is discovered. *Matter of Jennings*, 31 B.R. 378 (Bkrtcy.S.D.Ohio, W.D.1983). To hold otherwise would be to invite mass dismissal and refiling of petitions at the mere whim of debtors with the inherent prejudice to creditors. *In re Pagnotta*, 22 B.R. 521 (Bkrtcy.D.Md.1982).

■ Since the record was substantially replete with evidence of fraud, the Court, pursuant to 18 U.S.C. § 3057, is furnishing both a copy of this Memorandum Opinion, its Order and a transcript of the hearing to the United States Attorney for the Eastern District of Arkansas for such investigation as he may deem appropriate.

The motions to dismiss are denied.